Plaintiff, who was a motorman operating a streetcar, brings this damage suit for $16,035 against T. S.C. Motor Freight Lines, a partnership, and its component partners, jointly and in solido, alleging that he was seriously injured in a collision between the streetcar and a large tractor and trailer owned by defendants and driven by their employee, on April 3, 1945, at about nine o'clock in the evening.
The accident happened at the intersection of Magazine and St. Joseph Streets. The streetcar was travelling in an uptown direction on Magazine Street, which is a one-way street approximately forty feet in width, and the tractor and trailer (which we shall hereafter designate as the "truck") was proceeding on the right-hand side of St. Joseph Street, a two-way street, out towards the lake. The front of the streetcar struck the right side of the truck, overturning it; the front vestibule of the streetcar was demolished. Plaintiff suffered physical injuries.
The petition alleges that the accident resulted from the negligence of the driver of the truck, chiefly because he did not stop, look, and listen, and did not give consideration to the prevailing circumstances before attempting to cross, but elected to gamble that he could beat the streetcar over the intersection.
The owners of the truck denied negligence on the part of their driver, and alternatively attributed the collision to the contributory negligence of plaintiff, charging, among other things, that he was operating the streetcar at a fast and negligent speed, and that he failed to see the truck in time to apply his brakes and avoid the accident.
The New Orleans Public Service, Inc., plaintiff's employer, intervened, claiming that plaintiff's injuries rendered it liable to him for workman's compensation, some of which it had paid, and that under the provisions of Act 20 of 1914, as amended, it is the subrogee of plaintiff to the extent of its compensation liability. The intervenor prayed for reimbursement, out of any judgment plaintiff may recover, for the payments made to plaintiff, together with medical expenses and a reasonable attorney's fee, plus whatever future compensation it may be required to pay.
After a trial on the merits, plaintiff recovered judgment for $11,185; the intervenor was decreed to be entitled to $1,000, plus attorney's fees, "same to be paid by preference out of the award in favor of Harold C. French, plaintiff; and further that the intervenor's liability for compensation shall, upon payment of the principal judgment to Harold C. French, plaintiff, cease for such part of the compensation due under the Employers' Liability Act of Louisiana, computed at six percentum (6%) per annum, as shall be satisfied by such payment." The fee of one of the medical experts was taxed as costs against the defendants, who have taken this suspensive appeal from the judgment.
The record abounds with divergent opinions as to speed and distances, and there is much disagreement as to the vital and material question of how far the streetcar was from St. Joseph Street when the truck reached the car track.
It is conceded, at any rate clearly proved, that the truck did not come to a full stop before crossing the car track. The testimony of Guidry, the driver, who was defendants' employee, is that he started with a heavy load from the T. S.C. terminal, which is located approximately a half block *Page 365 
from Magazine Street, and travelled in second gear at about six miles an hour to Magazine Street, where, because of the blind corner and vehicles parked along the curb of Magazine Street, he nosed out to within three or four feet of the riverside car rail and there came "almost to a stop" a "momently stop" which is "just as good as a stop." He noticed the streetcar about 150 feet away travelling at a speed which he could not judge, but believing he could make it across the track safely, started forward at about four or five miles an hour. He never saw the car again until the impact, and at no time did he hear the sound of its gong.
Guidry stated that the truck was hit at about the spare tire, which is located just in front of the rear wheels of the trailer.
On the other hand, French, the motorman, testified that after having made a service stop at Julia Street he continued up Magazine Street, and that when his car was about fifty or sixty feet from St. Joseph Street he noticed the truck, which had just reached the property line, coming into Magazine Street at about twelve or fifteen miles per hour, and that it made no stop; his own speed was then about eighteen or nineteen miles an hour. He immediately cut off the power, applied the emergency brakes, and sounded the gong, but his stopping distance was not sufficient and the car struck the trailer about five feet from its front end.
Several passengers on the streetcar testified for plaintiff. Their attention was attracted by the loud clanging of the streetcar gong, causing them to look up and notice the conditions existing at the intersection.
A Mr. and Mrs. Kirby J. St. Romain occupied the left front seat of the streetcar. St. Romain stated that when he first saw the truck it was about thirty or forty feet from the car track, coming from the left at about twenty or twenty-five miles an hour, and that the streetcar was then about thirty or forty feet from the intersection. However, on cross examination, the witness testified that he was in error in stating that the truck was thirty or forty feet from the car track when he first saw it, but that it was "pretty close to the front end of the car." Mrs. St. Romain noticed the truck coming from the left crossing Magazine Street at a moderate speed, and that it had not yet reached the car track. She fixed the distance the car was from the intersection as that from the witness chair to the rear wall of the courtroom (which measures forty-three feet, two inches). Her impression was that the car struck the truck at a point between the tractor and the trailer.
Another passenger, Robert D. Brown, Jr., who occupied a seat on the right-hand side towards the rear of the streetcar, stated that when the car was 100 to 115 feet from St. Joseph Street he looked up upon hearing a loud gonging and saw the truck moving at "normal" speed; that it was about two and one-half feet beyond the sidewalk curb at that time, but it continued onward and was struck about eight feet from the right rear wheel.
James Weber, who was seated at about the center on the right-hand side of the streetcar, testified on direct examination that he looked up and saw the truck coming out into Magazine Street, and that it was "all the way out." This testimony he later changed by saying that the truck was "just starting to come out St. Joseph Street" when he first observed it, and that no part of the truck was on the track. He placed the streetcar at fifty feet from the corner when the gong sounded, and thirty feet away when he observed the truck "just creeping out." On cross examination, the witness persisted in this testimony until there was read to him a statement which he had given and signed on the night of the accident while still at the scene, to the effect that the streetcar was about a half block from the intersection when he first saw the truck. He retracted his testimony and asserted that the recitals contained in the written statement are correct.
The conductorette, Thais Reilly, looked up when the gong was violently clanged, and "the car was close to the intersection."
Besides Guidry, the defendants produced two of their employees as witnesses. Savoy stated that he had just left the terminal, was walking back St. Joseph Street on his way home, and had crossed Magazine Street. He noticed the truck starting across, *Page 366 
and at the same time saw the car a half block away. Riggio, defendants' night mechanic, was standing on the uptown-river corner of the intersection, but did not see the car or the truck before the accident, and paid no attention to either vehicle before the impact. The gist of his testimony is that he is sure the truck stopped before it attempted to cross the track, because he heard the sound of its air brakes being applied, followed by the sound of the truck starting off.
Magazine Street, by virtue of the streetcar line thereon, is a right-of-way street under the traffic ordinance, and all vehicles are required to come to a full stop before crossing. Ordinance 14,104, C. C. S., adopted May 9, 1934, which amends paragraph (b) of Section 2 of Article VII of Ordinance 13,702, C. C. S., provides: "Section 2.(b) Every operator of any * * * vehicle * * * on any street intersecting any other street, on which street cars or trains are routed by any Ordinance of the City, shall come to a full stop where the street on which they are travelling meets the prolongation of the nearest property line of such other street they are about to enter or cross, and shall listen and look for approaching street cars and trains before crossing or turning into said street, * * *."
We experience little difficulty in concluding that Guidry was guilty of negligence in attempting to drive the truck across the car track under the circumstances prevailing when the attempt was made. The trailer and tractor had an overall length of forty-three feet and was heavily laden, weighing some 35,000 pounds including the freight load. The traffic rule emphatically enjoins the driver of a vehicle, before crossing a street having a car line, to first stop, look, and listen. Guidry admits that he did not come to a stop. Considering the character of his vehicle, we believe that had he been a reasonably prudent person caution would have dictated that a literal compliance with the provisions of the ordinance was necessary. What we said in the case of Arena v. Morris Co., 14 La. App. 563, 130 So. 565, 566, is pertinent here: "The traffic ordinance requiring a vehicle approaching a right of way street to come to a full stop must be observed literally; it will not be sufficient to slacken speed."
Appellants argue that the fundamental error committed by the trial judge lay in his failure to give consideration to the plea of contributory negligence, to which we now advert.
It is well settled that contributory negligence is a defense which must be specially pleaded to warrant its consideration, and that the defendant carries the burden of proving the allegations relied upon by him. Gaiennie v. Cooperative Produce Co., 196 La. 417, 199 So. 377; Whittington v. Western Union Telegraph Co., La. App., 193 So. 498, 499; Althans v. Toye Bros. Yellow Cab Co., La. App., 191 So. 717.
The motorman estimated the speed of the streetcar at eighteen or nineteen miles per hour. Sidney S. Gale, the superintendent of maintenance of the New Orleans Public Service, Inc., was produced as a witness by plaintiff, and estimated from a map of the public service company that the distance from Julia Street, where the car had last stopped, to the property line of St. Joseph Street, was about 575 feet. The witness stated that if the motorman had attained a speed of eighteen or nineteen miles an hour before reaching St. Joseph Street, he would have had to be "notching as fast as he could."
Counsel contends that a streetcar has no preferential rights at a crossing, and that French was negligent in operating his car toward St. Joseph Street, a much travelled crossing, at a dangerous speed without being on the alert and having the car under control so as to be able to avoid a collision with a vehicle traversing the intersection.
We are referred to Bacon v. New Orleans Public Service, Inc., 18 La. App. 96, 137 So. 213, 866, wherein this court held that in the absence of a city ordinance, both streetcars and motor vehicles have equal rights at crossings. The cited case is not apposite, as it was decided in 1931 before the advent of the amendment to Ordinance 13,702, C. C. S. The ordinance as amended now unmistakably grants a streetcar the right of way. *Page 367 
As we view the case, the plea involves a determination of only two questions: how far was the streetcar from St. Joseph Street when the truck came into view? and, was the motorman alert?
As stated before, there is a divergence in the witnesses' opinions, and in the estimation of distances there is great variance. The motorman, the St. Romains, and the conductorette placed the streetcar close to the intersection when the truck came out into St. Joseph Street. Weber's conflicting and confused statements are not at all helpful. On the other hand, Guidry, the truck driver, and Riggio placed the streetcar at a half block, or about 150 feet, away. The trial judge, in his reasons dictated into the record at the conclusion of the trial, made the observation that the testimony of the plaintiff witnesses impressed him, and particularly the testimony of Mrs. St. Romain and Brown. However, the latter did not quite agree with Mrs. St. Romain; he stated that the car was about 100 to 115 feet from the corner when he looked up because of the loud ringing of the gong. We think the discrepancy can be easily understood. The streetcar is about forty-seven feet in length, and Brown was sitting on the right-hand side towards its rear, which point of vantage was not as good as that of Mrs. St. Romain, who was occupying the front left seat. In view of Brown's position, it is obvious that it would have been difficult for him to know with exactness how far the front of the car was from the intersection.
The brakes of the streetcar, according to the testimony of the motorman and two other employees of the public service company, were in good working condition. According to one witness, a brake inspection is made once each week.
Gale also testified as to the operation of a streetcar and maximum stopping distances. At a speed of twenty miles an hour, a "900" type car, such as was involved in the collision, cannot be brought to a stop in less than 133 feet, and at eighteen miles an hour the stopping distance would be 110 feet. If travelling at fifteen miles an hour, the car could be stopped in ninety feet.
The trial judge mentioned that Guidry, who lives in Lafayette, Louisiana, did not appear to be too intelligent or familiar with the streets of New Orleans and the traffic regulations. Upon a consideration of Guidry's testimony, we quite agree with this appraisal. Guidry himself admits indifference; after he took the first look at the streetcar he gave no further heed to it, and states that he did not hear the sound of its gong, although the motorman and the passengers in the car were emphatic that the bell was clanged violently.
After carefully sifting and analyzing the evidence, it is our opinion that when the ponderous truck started across the track the streetcar was in close proximity, and that there was insufficient space to permit the motorman to bring it to a stop in time to avert the accident. All passengers who testified corroborated French's statements that he remained at the controls until the moment of the impact, cutting off the power and applying the brakes, and though the speed was reduced, the car struck the truck.
Counsel points to testimony given by Brown and the conductorette to the effect that before French pounded the gong with considerable force they heard it being tapped lightly, and argues that this would indicate that instead of applying his brakes immediately upon seeing the truck, the motorman tapped the gong lightly and did not utilize the brakes until afterward when a collision appeared imminent. This is theory only, as we find no evidence in the record supporting it. French testified that he simultaneously violently clanged the bell, cut off the power, and applied the brakes at his first view of the truck.
We think that Guidry's utter disregard of the ordinance, and his recklessness in attempting to cross Magazine Street without bringing his large vehicle to a full stop and surveying carefully the prevailing traffic conditions, can be pointed to as the sole cause of the collision. We fail to see that the motorman was guilty of any act of commission or omission proximately contributing to the accident. It seems that he used every means possible to stop his car upon seeing the truck coming into Magazine *Page 368 
Street. We do not think defendants have met the burden imposed upon them by their plea.
Counsel for defendants cited several cases, each of which can without difficulty be distinguished from the one under consideration. In Boylan v. New Orleans Ry. Light Co.,139 La. 185, 71 So. 360, 363, Ann.Cas.1918A, 287, the Supreme Court held a motorman to be guilty of negligence in running a streetcar into a fire engine. The motorman's negligence was expressed as follows: "The motorman was not careful; he did not see the truck when he ought to have seen it. He was disobeying the rules of the company a moment before the accident happened, as well as the state statute and a municipal ordinance; and he was running the car across a very busy street at a very high rate of speed."
In Bacon v. New Orleans Public Service, Inc., supra, we said the motorman was negligent in failing to observe a truck and keep it under surveillance, knowing that it must cross his path. He first observed the truck from a distance of 300 feet.
Counsel confidently relies upon Peterson v. New Orleans Ry. Light Co., 142 La. 835, 77 So. 647. But there the motorman saw the other vehicle enter the intersecting street when the trolley car was about 200 feet from the crossing.
In Sparks Bros. McGee v. New Orleans Ry. Light Co., 5 Orleans App. 117, decided in 1908, we held a motorman negligent because he had ample time and space within which to stop the car or slacken its speed, so as to avoid running into a wagon, but failed to do so.
The plaintiff sustained painful and permanent injuries. He remained at the controls of the streetcar up to the time of the impact and was knocked down and pinned on the floor beneath the wreckage when the front end of the car gave way. He was taken to the Charity Hospital and on the following day was removed to the Southern Baptist Hospital, in which institution he remained for a period of seven weeks. His whole body Was black and blue from his ankles to his chest. His chest was strapped on both sides, and his left leg was placed in a cast from the ankle to twelve inches above the knee. The cast was not removed until just before he left the hospital. For three or four months afterwards he used crutches. Plaintiff visited the physician of the public service company twice each week between May and September, 1945.
Plaintiff testified that the company physician's treatments were unavailing, and that he continued to experience pain and disability. He engaged Dr. George C. Battalora and visited him on January 9, 1946, for examination. The X-rays revealed evidence of a healed compression fracture of the external condyle of the upper end of the tibia of the left leg, which had united with some depression of the tibial plateau on the lateral side. The examination disclosed that there was an abnormal motion, indicative of some tearing of the supporting tendons. When standing, plaintiff was knock-kneed in the left leg. Dr. Battalora prescribed a special orthopedic shoe.
When plaintiff visited Dr. Battalora on June 6, 1946, atrophy in the left thigh was noticed. The circumference of the left thigh in its middle third was 20 3/4 inches; on the right leg it was 21 1/8 inches. Dr. Battalora stated that whenever a patient has a condition in the knee joint that produces pain, there is a disturbance of the blood supply to the muscles of the thigh, and atrophy occurs even though the patient is attempting to use the limb. The left leg also showed crepitation, which is an audible or palpable grating sensation. Dr. Battalora was of the opinion that this type of condition causes considerable difficulty to a patient having to stand constantly. His belief was that plaintiff could not remain standing for more than a half-hour at a time. He estimated a twenty-five per cent disability in loss of use of the left leg.
French testified that the public service company refused to reemploy him as a motorman because of his condition, and that the injuries have prevented him from doing any other work, except when on one occasion he took a watchman's job for a few days and earned $27.50. He is forty-two years of age, is married, and has three children depending upon him for support. *Page 369 
Dr. J. T. O'Ferrall, appearing for defendants, examined French during 1946 and again a few days before the trial. His testimony was confined to findings on the latter examination. The examination, accompanied by X-rays, revealed a fracture of the internal condyle of the femur, which he believed was either a fracture of the femur itself or a calcareous deposit within the lateral ligament. There was presence of some pronation of the left foot, but knee motions seemed normal. Dr. O'Ferrall found a ten or fifteen per cent disability, which was not so extensive as to prevent French from carrying on the duties of a motorman. This opinion was based on the doctor's theory that motormen sit down a great deal of the time. He saw no reason why French could not stand for periods of about thirty minutes without difficulty.
Plaintiff, at the suggestion of the judge below, disrobed during the trial and the physicians examined him. That there is some disability is conclusive, as both doctors agreed to as much. The extent of the disability only was disputed.
Dr. O'Ferrall was positive that plaintiff's condition could be corrected by the removal of a small bone in the knee, which is a minor operation requiring an incision of not more than an inch, with a convalescence period of about two weeks. French refused to submit to the suggested operation, on the ground that Dr. Battalora had advised him not to do so.
Defendants' counsel, while conceding that an injured person cannot be compelled to undergo an operation, argues that the refusal to undergo an ordinary operation must be considered in assessing damages. He points to the case of Donovan v. New Orleans Ry. Light Co., 132 La. 239, 61 So. 216, 48 L.R.A., N.S., 109, wherein the court said that the science of surgery had made great progress and that surgical operations should not be looked upon with the horror they inspired in former years, and that where a plaintiff declines to undergo a slight operation that fact must be considered as minimizing his chances of recovery.
However, we cannot disregard Dr. Battalora's statements regarding the surgical procedure. He was positive that operations of the type suggested by Dr. O'Ferrall had not proved successful enough to warrant a patient taking a chance, and so advised French. We do not believe that plaintiff's reliance on his own physician's advice should militate against his right to recover.
Considering the testimony to the effect that a streetcar motorman is required to stand while operating the car through the business district, and considering the fact that both physicians noted disability in the left leg which inhibits plaintiff from standing for long periods, our opinion is that he was unable, up to the time of the trial, to return to his former employment. It must be remembered too that plaintiff wears the special orthopedic shoe. In this case we do not agree with plaintiff's counsel that French should be classified as being totally and permanently disabled from doing any kind of work. We are not concerned with the provisions of the Workmen's Compensation Act, for the reason that the provisions thereof are not to be applied to this tort action. While French could not return to his former employment, nonetheless he is not so disabled that he cannot engage himself in other pursuits or fulfill the duties of other gainful occupations.
The lower court awarded plaintiff $11,185, but we have not been favored with an itemization. The evidence shows that plaintiff's medical expenses amounted to $35, and that his loss of salary (thirty-two months) amounted to $5,760. Believing that the trial judge allowed the above two items, $5,390 was undoubtedly awarded for the personal injuries. There is no doubt plaintiff's injuries were painful and serious, and we cannot say that the amount allowed is excessive.
Defendants' counsel cites a number of cases in support of the argument that the judgment is highly excessive. As has been stated on numerous occasions, there is no rule or standard for measuring damages to be awarded a plaintiff for personal injuries. Each case must stand on its own facts, and *Page 370 
the facts which we glean from the record in this case fully warrant the affirmation of the judgment appealed from.
There is no complaint made insofar as the judgment runs in favor of New Orleans Public Service, Inc., French's compensation debtor, for the amount of workmen's compensation paid, attorney's fees, and also for future compensation liability.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.